IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 21-cr-00420-RMR

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.  JONATHAN ROOKS,

    Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S PSR OBJECTION

    The United States of America, by and through the undersigned Assistant United States Attorney, respectfully submits the following response to the defendant's objections to the Presentence Investigation Report ("PSR").  ECF #47.

    <u>Paragraph 59</u>.  The PSR (ECF #40) adds two levels pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of a firearm.  The defendant objects to the application of this enhancement.  ECF #47.

    The Guidelines call for the application of the U.S.S.G. § 2D1.1(b)(1) enhancement "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1 app. note 11(A).  The Application Note to the Guideline gives an example of when connection to the offense might be "clearly improbable:" when a defendant, "arrested at the defendant's residence, had an unloaded hunting rifle in the closet."  *Id.*  And the Application Note explains the intended purpose of the enhancement: it "reflects the increased danger of

violence when drug traffickers possess weapons." *Id.*

In order for the enhancement to apply, the "government must show by a preponderance of the evidence that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." United States v. Sallis, 533 F.3d 1218, 1225 (10th Cir. 2008) (internal quotation marks omitted).  In other words, possession under § 2D1.1(b)(1) is "satisfied by showing mere proximity to the offense." United States v. Smith, 131 F.3d 1392, 1400 (10th Cir.1997). "For purposes of § 2D1.1(b)(1), the government need only show that the weapon was found in the same location where drugs or drug paraphernalia are stored." United States v. Zavalza-Rodriguez, 379 F.3d 1182, 1187 (10th Cir. 2004) (internal quotation marks omitted); see also United States v. McClure, 358 Fed. App'x 5, 11 (10th Cir. 2009) ("[T]he government need only show the weapon was found in the same location where drugs or drug paraphernalia are stored or in the general vicinity of where part of the drug activity occurred.").  "The plain language of section 2D1.1(b)(1) and its commentary permit a trial judge to enhance a drug defendant's sentence for mere possession of a dangerous weapon even if there is no evidence other than proximity to suggest the gun was connected to the offense." United States v. Roberts, 980 F.2d 645, 647 (10th Cir. 1992).

Here, the PSR lists the eight serialized firearms that were found in the defendant's home.  PSR ¶ 59.  As the PSR also correctly notes, the defendant had ammunition and magazines for many of these weapons; four of the magazines were loaded.  PSR ¶ 40, 59.  And, all of the weapons and ammunition were in the same residence where the defendant—a darknet drug dealer—was storing, packaging, and

2

distributing fentanyl.  PSR ¶ 59.

The defendant contends that the guns were clearly unconnected to the offense conduct here.  First, he asserts that he had the firearms because he is a firearm hobbyist who grew up around guns.  Second, he argues that the online nature of his drug distribution business is such that the guns had nothing to do with the offense.

Neither of these arguments make it "clearly improbable" that the firearms were connected to the offense.  First, because the defendant is previously convicted felon, it was illegal for him to own every single firearm and every single individual piece of ammunition found in his home.  Accordingly, his acquisition of all the guns and ammunition was also illegal—and if he acquired the guns before his first felony conviction, his retention of the firearms was illegal.  So, the defendant was not a "firearms hobbyist" in the way that we typically think of individuals who research, collect, display, and shoot firearms at a range.  Rather, he was a felon who had accumulated a large collection of illegal guns and kept those firearms in the same place where he was distributing drugs.

Second, simply because the defendant's method of distributing drugs relied on mailing the drugs rather than face-to-face distribution does not mean that the firearms were not connected to the offense.  Rather, the core of the defendant's business was at his residence—that is where he took orders, kept his cryptocurrency, received and stored pills, packaged pills, and departed from to get the orders to the post office and ultimately to his customers.  It is entirely plausible that keeping firearms at the residence made the defendant feel safer in the face of his very dangerous occupation.

In sum, the defendant's possession of numerous firearms and ammunition is

unlike a defendant who keeps an unloaded hunting rifle in his closet.  The Government has met its burden here to show that "that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant," Sallis, 533 F.3d at 1218, and it is not "clearly improbable" that the weapons were connected to the offense.

Paragraphs 63-66. The PSR adds two levels pursuant to U.S.S.G. § 2D1.1(b)(12) for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance."  The defendant objects to the application of this enhancement.  ECF #47.

As described in the PSR and herein, the defendant was a darknet vendor who used his premises as home base for his drug distribution business.  At the residence, he had all of the trappings of a traditional drug business, including scales, a money counter, a pill press, drug ledgers, packaging materials, guns, a fentanyl test kit, and distribution quantities of fentanyl.  The defendant took darknet orders for fentanyl on a computer at his residence, packaged the drugs at his residence, and then left from his residence to take the drugs to a post office to ship to his customers.

The defendant argues that because he did not literally sell drugs to customers directly out of his house, the enhancement does not apply to him.  But, if this was the rule, then this enhancement could *never* apply to darknet drug dealers, resulting in the absurd outcome that a darknet drug dealer—who is already taking extraordinary steps to conceal himself from law enforcement—would also be insulated from consequences that apply to traditional drug dealers who, instead of driving to the post office, meet their customers on the street.  The Court should put no stock in the imagined distinction between a drug dealer who, like the defendant, stores drugs in his house but drives to

4

the post office to distribute them to customers and a drug dealer who stores drugs in his house and then walks out onto the street to sell them to his customer.  Holding otherwise would reward individuals like the defendant who have the knowledge and resources to control a drug business from the safety and perceived anonymity of a computer.

In addition, from this perspective, the defendant's argument that no transactions took place from the defendant's home falls apart.  It is true that customers did not come to the defendant's home—that is a hallmark of darknet drug dealing.  But, the defendant received orders at his home, via computer.  He fulfilled those orders at his home by counting, weighing, testing, and packaging drugs.  And he distributed the drugs from his home by taking those packages, getting in his car, and driving to the post office.  The fact that he did not meet customers face-to-face is a distinction without a difference.

Finally, it is well-established that simply because a defendant is also living in a premises as his primary residence does not mean that the U.S.S.G. § 2D1.1(b)(12) is inapplicable.  As the PSR notes, in United States v. Murphy, 901 F.3d 1185 (10th Cir. 2018), the Tenth Circuit rejected an argument that the enhancement was inapplicable to a defendant who used the premises as a primary residence but also conducted two drug sales out of his home.  The defendant argues that Murphy is inapplicable because the defendant here conducted no drug sales out of his home.  But, as discussed above, this is untrue.  In fact, as described above, the defendant in the instant case conducted *all* of his drug sales out of his home.  The defendant's residence was the only place out of which his drug business was conducted.  And, importantly, this was a business that was the defendant's only (or primary) source of income.  Murphy, 901 F.3d at 1193 ("In

5

addition, Murphy's circumstances during the relevant time are relevant. He had no legitimate employment or other identifiable and legitimate source of income. Drug-trafficking (and theft) seem to be his main, if not sole, source of funds (and a substantial one, at that).").

The Government respectfully requests that the Court deny the defendant's objections to the PSR and apply the enhancements as described herein.

Respectfully submitted this 12th day of January, 2023.

                               COLE FINEGAN
                               United States Attorney

By:   *s/ Andrea Surratt*
        Andrea Surratt
        Assistant United States Attorney
        U.S. Attorney's Office
        1801 California St., Suite 1600
        Denver, CO 80202
        Telephone: (303) 454-0100
        e-mail: Andrea.Surratt@usdoj.gov
        Attorney for the Government